# 𝔕𝔦𝔠𝔥𝔪𝔬𝔫𝔡.

## CARY V. HOLT'S EX'ORS.

### January 11, 1917.

1. CONTRACTS—*Construction.*—Where a contract refers to prior contracts, to which one of the parties was a party, for further particulars, it must be construed with reference to such prior contracts.

2. CORPORATIONS—*Promoters—Construction of Contract.*—The preamble of a contract recited that the organization of a company for dealing in the purchase and sale of coal lands was effected upon the understanding that appellant "should advance three-fourths of the cost of said property" (referring to said coal lands) "or so much thereof as might be necessary for the purposes of the company," and that he should have a certain part of all profits to be made upon the said advancements through the organization of said company to take over the coal lands. Three prior contracts of the appellant with other parties in regard to the same enterprise were referred to for further particulars. The preamble also recited that under these prior contracts appellant "would be required to advance only so much" of his agreed input aforesaid "as might be required to pay the cost of the property before a sale of the same by the company was effected." From the body of the contract it appeared that appellant for a certain sum sold to the appellees part of his interest under the prior contracts in the stock of the corporation. The contract further provided that in case any further input of cash towards the payment of appellant's "input of three-fourths of said purchase money is required of and made by him," appellees' interest should be reduced. One of the prior contracts contained a provision that, "All expenses incident to the successful carrying out of the purposes of said corporation are to be borne by the said corporation." Appellant paid into the treasury of the corporation a sum of money to cover the expenses of such corporation due to its payment to the appellant of that amount on account of his salary.

   *Held:* That appellant was obligated by his contract to pay into the treasury of the corporation his proportion of "all

expenses incident to the successful carrying out of the purposes of the said corporation," as well as to pay what was strictly purchase money of the company's property, and that his salary was such an expense.

3. CORPORATIONS—*Promoters—Sale of Part of Promoter's Interest.*—Appellees upon the purchase of an interest in appellant's contract, knowing of the provisions of the above contract and of a resolution of the board of directors fixing appellant's salary, were charged with notice of his rights.

4. CORPORATIONS—*Estoppel of Director.*—Under a pooling agreement made at the time of a sale of part of the interest of appellant to appellees, it was agreed that the president's salary should be arranged at a stockholder's meeting.

*Held:* That notwithstanding this agreement, appellees could not object to the salary fixed at a director's meeting, where one of them who also represented the other took part in the action.

5. ESTOPPEL.—Letters written by appellant to appellees, stating the amount of indebtedness against the company, which failed to mention expressly the salary expense, but which urged appellees to come at once and to look into everything for themselves, did not operate to estop appellant from claiming the salary expense.

6. CORPORATIONS—*Promoters—Construction.*—The salary expense, having been treated by the corporation in effect as a necessary expense attendant upon the acquisition of the lands of the company, and having been so recognized by the appellees, should be computed as input of appellant in calculating the proportion of common stock to which he is entitled.

7. CORPORATIONS—*Promoters—Necessary Expenses.*—Appellant paid into the treasury of the company a certain sum to cover the expenses of the corporation for office rent and stenographer's hire. This was properly held by the court below to be an input of the appellant into the corporation, which he is entitled to have computed in the calculation of the amount of common stock of such corporation to which he is entitled, there being a resolution of the board of directors that a bill rendered by appellant for such rent and stenographer's hire be paid.

8. CORPORATIONS—*Promoters Contract to Pay Necessary Expenses.*—A payment by appellant at the treasury for necessary expenses should be computed as an input of defendant in calculating the proportion of common stock to which he was entitled, although funds were received by the corporation because of the exercise of an option subsequent to the input and before the obligations became payable.

Appeal from the Law and Equity Court of the city of Richmond. Decree for plaintiffs. Defendant appeals.

*Reversed.*

The opinion states the case.

*James E. Cannon* and *Samuel A. Anderson,* for the appellant.

*J. M. Perry,* for the appellees.

SIMS, J., delivered the opinion of the court.

The question before us in this case is, What proportion of the common stock of the Buchanan Coal and Coke Co., Inc., belongs to appellant and appellees, respectively?

The business of the Buchanan Coal and Coke Co., Inc., was that of dealing in the purchase and sale of coal lands, including lands in fee and mineral, mining and surface rights pertaining to such lands. Its authorized capital stock was $500,000, of which $200,000 was authorized to be issued as preferred stock and $300,000 as common stock.

What proportion of said common stock belongs to appellant and what to appellees depends upon the construction of the contract of March 27, 1908, under which these parties claim such stock, designated in the record as the "sale contract," and upon certain facts as to items in controversy of input of appellant into the capital of said company.

The following statement will sufficiently disclose the provisions of the "sale contract" which are pertinent to the question before us:

It is recited in the preamble of this contract that the organization of said company was effected upon the distinct understanding that appellant "should advance three-fourths *of the cost of said property"* (referring to said coal lands) "or so much thereof as might be necessary for the purposes

of the company," and that he should have 11/18 of all profits to be made upon said advancements to be realized through the organization of said company to take over said lands; the contract of appellant with certain Harrises is referred to "for further particulars;" three prior contracts in writing between appellant and the Harrises are referred to, which contain "the contract with the Harrises;" and it is further recited in said preamble that it is provided in the contract of appellant with the Harrises that appellant "would be required to advance only so much" of his agreed input aforesaid *"as might be required to pay the cost of the property before a sale of the same by the company was effected,* and that all common stock of the company (except twenty-three shares thereof held by Smarr and Boyd * *) should be divided between the parties to said" (the Harrises) "contract in the proportion above mentioned," (*i. e.,* 7/18 to the Harrises and 11/18 to appellant).

The "sale contract" preamble further recites what amounts of input of capital of the company the Harrises and appellant, respectively, had made up to the date of such contract.

From the body of this contract itself it appears that appellant, on the date thereof, March 27, 1908, for $15,000 cash in hand paid, sold to Charles A. Holt and Julius L. Witz 15/83 part of his 11/18 interest *"under his said contract with the said Harrises in and to the capital stock of* said Buchanan Coal and Coke Co., Inc.," with the provision, however, that the said 15/83 part of appellant's said interest so sold "is subject to reduction, ratably with said Cary's" (appellant's) "remaining sixty-eight eighty-thirds (68/83) part thereof, in case of the necessity of further cash input and of actual cash input by said Cary *under his said contract with the Harrises,* to the extent hereinbelow stated and no further." Then follows the provision that "in case any further input of cash towards the payment of

said Cary's input of three-fourths of *said purchase money* is required of and made by him * * * the said Holt and the said Witz, under this agreement * * shall be entitled to such proportion of eleven-eighteenths of 2,977 shares of common stock * * of said Buchanan Coal and Coke Co., Inc., * * as · is represented by a fraction whose numerator is fifteen and whose denominator is eighty-three, plus the number of thousands ($1,000.00 being the unit) of dollars of such additional actual input made before sale * * *"

"The contract with the Harrises" referred to in said "sale contract" was contained in three contracts in writing, specifically mentioned in the preamble of the "sale contract," one of March 6, 1908, another of September 3, 1904, and still another of May 23, 1904.

These contracts provide, in effect, that the input of appellant into the company shall be three-fourths of the capital necessary for the transaction of its said business. Beyond this there is nothing in the March 6, 1908, contract which is material to the question before us.

The only provision in the contract of September, 1904, having any special bearing on the question before us is the following:

. "* * it is agreed that *any expense of said company* which is paid in the common stock of the company is to fall equally upon, or be paid equally by, all and each party to the agreement."

The contract of May 23, 1904, provides, in effect, that the input which appellant was obligated to make into said company should be paid for preferred stock of such company; that the preferred stock should be issued at par and only for the necessary capital of the company; that this stock should bear interest at the rate of 6% per annum, and that when the property of the company should be sold, or its affairs came to be wound up," * * * it is further agreed

34

that after redeeming the preferred stock   *   *   and paying the interest on amounts invested in said preferred stock by the parties hereto, that all other money, land or property remaining to said corporation" (the Buchanan Coal and Coke Co., Inc.),"shall be treated as profit and belong to the common stockholders." It then contains the following clause:

*"All expenses incident to the successful carrying out of the purposes of said corporation are to be borne by the said corporation."*

(The italics appearing in quotations above are supplied by us).

With respect to input of the appellant into the said company, the following should be here said:

There are two items of such input in controversy before us.

(a) The amount of $5,050.00, which appellant paid into the treasury of said company between April 1, 1908, and October 4, 1909, inclusive, to cover the expenses of such corporation due to its payment to appellant of such amount on account of his salary of $200.00 per month from May 1, 1907, to October 4, 1909, for services to the company in and about the purchase of the property; and

(b) The amount of $1,088.00 which appellant paid into the treasury of said company February 27, 1909, to cover expenses of such corporation for office rent and stenographer's hire from July 1, 1904, to May 1, 1907.

The decree of the court below, entered October 11, 1915, held that while appellant was justly and legally entitled to the item (a) above noted as salary, such item of $5,050.00 should not be computed as input of appellant under said sale contract because this item "in the opinion of the court was not a necessary expense attendant upon the acquisition of the said lands of said defendant company." This hold-

ing is the sole ground of error assigned before us by appellant.

The court below held that said item "(b)" should be computed as input of appellant under said "sale contract," and this is assigned as cross-error before us by appellees.

Appellees also assign as cross-error that there was a mistake in the figures of $102,200, total input claimed by appellant.

We have, therefore, but the three questions to decide, which we will consider in their order as stated below, namely:

1. Was the $5,050 item (a) above referred to an input of appellant into said corporation which he is entitled to have computed in the calculation of the amount of common stock of such corporation to which he is entitled?

We think it was. The "sale contract" referred to the existing agreement between appellant and the Harrises as fixing the "input" into the treasury of the said corporation which appellant had contracted to make and by which his proportion of the common stock of such corporation was to be ascertained. Such existing agreement was contained in said prior contracts above referred to, of dates May 23, 1904, September 3, 1904, and March 6, 1908. The "sale contract" must therefore be construed along with such three prior contracts in determining what "input" aforesaid appellant had contracted to make and by which his proportion of common stock aforesaid was to be ascertained. While it is true that there is a phrase in the "sale contract" which refers to such "input" as being "any further input of cash towards the payment of said Cary's agreed input of three-fourths of said *purchase money*" of *the company's property,* in the same "sale contract" Cary's agreed input of three-fourths of the *cost of the company's property* is used with the same meaning. Therefore, it is

manifest that the true construction of the "sale contract" could not be that appellant's said "input" must have been confined to money actually paid to the vendors of the property as purchase money. Some expenses of the company or corporation aforesaid were clearly contemplated by the "sale contract" as included in the language "purchase money" or "cost of the company's property." This is admitted in the bill of appellees where the position is taken that "the amount of expenses paid by said corporation * * actually constituting a part of the cost of said lands" are properly to be computed, where contributed by appellant as his "input" aforesaid; and in the brief of counsel for appellees the same position is taken. Now when we look to the contract of September 3, 1904, we see that other expenses than actual payment by the corporation of purchase money to vendors of the property of the company are contemplated. Further, when we look to the contract of May 23, 1904, which is the contract which fixes the obligation of appellant with respect to *input* aforesaid, we find this express language with reference to what expenses are to be paid by the corporation, to-wit:

"All expenses incident to the successful carrying out of the purposes of the said corporation are to be borne by the said corporation."

It is, therefore, clear that the true construction of the "sale contract" is that appellant was obligated thereby to pay into the treasury of the corporation his proportion of three-fourths or so much thereof as was needed to defray "all expenses incident to the successful carrying out of the purposes of the said corporation" as well as to pay what was strictly "purchase money" of the company's property. The evidence is further that appellee Witz and the decedent Holt, of whom the executor appellee is the personal representative, knew of all of the provisions of all of said prior contracts before the "sale contract" was entered into.

The inquiry with respect to the item of input under consideration is reduced to this: Was this $5,050.00 of salary an item of the "expenses incident to the successful carrying out of the purposes of the said corporation?"

That it was such an item is shown by a resolution of the board of directors of the corporation adopted February 29, 1908, allowing appellant, as president thereof, a salary of $2,400.00 per annum, beginning with May 1, 1907. This, it is true, was prior to the date, March 27, 1908, of the "sale contract" by which appellees' rights were fixed; but it appears from a letter of date March 23, 1908, of counsel for Messrs. Holt and Witz, parties to such "sale contract," that Mr. Witz, who was acting for himself and Capt. Holt, knew of the salary expense of the corporation before the "sale contract" was entered into, and the only suggestion in the way of an objection to such expense was that Mr. Witz "is of opinion that the salary should be limited to a term of one year and its amount thereafter to be fixed by the pool; the permanent salary at a figure such as that now had, unless agreed to by the pool, would be unattractive to him."

At the date the "sale contract" was entered into, therefore, appellees are charged with knowledge that appellant was entitled to draw a salary of $200 per month from May 1, 1907, which as of March 31, 1908, would have amounted to $2,000, as an expense "incident to the successful carrying out of the purposes of the said corporation," and to defray which along with other outlay it followed from the provisions of the "sale contract" the "input" of appellant was obligated by him to be made, etc.

On the same date as the "sale contract," to-wit: March 27, 1908, a "pooling" agreement was entered into between appellant and the same other parties as those to the "sale contract." In this "pooling" agreement the said resolution

of February 29, 1908, of the board of directors of said corporation was referred to in the following language:

"The present salary of the president of said corporation, $200.00 per month, as fixed by directors' resolution of February 29, 1908, shall continue for the term of one year from the date of said resolution; but at the end of said term at a stockholders' meeting wherein such matters can be arranged, the trustees shall vote said common stock for such salary only to the president as shall be suggested to them by a writing signed by at least two-thirds in number of the parties hereto; and in default of such direction, shall vote against any further continuance of said salary after the end of the year commencing February 29, 1908."

This also evidences full notice to one appellee, Witz, and to Holt, under whom the other appellee claims, of the expense of salary incurred by said corporation up to February 29, 1909, which amounted to $4,400 of the $5,050 item under consideration.

On April 30, 1909, the entire membership being present, including said Witz, the directors of said corporation adopted the following resolution:

"Resolved, that the present salary of the president of this company shall continue at the same rate for another year, that is to say, from February 29, 1909, until February 29, 1910, he shall receive the salary of two hundred dollars per month, but in the event of a sale, this salary shall terminate when a deed is made by the company."

It is true this was an action of a directors' and not at a stockholders' meeting, as provided for in the said "pooling" agreement, but appellees cannot be heard to make this objection as Mr. Witz, representing himself and Mr. Holt, took part in this action.

Thus the remainder of said $5,050 input of appellant to cover said salary expense was authorized and approved by said corporation, and by appellees, in effect, as an item of

the expenses for the defraying of which appellant was obligated to make the input aforesaid and which he is entitled to have included in the computation of to what proportion of said common stock he is entitled under said "sale contract."

A letter of appellant, of date February 27, 1908, is relied on by appellees as an estoppel of appellant's claim that said $5,050 item was an expense of the corporation. This letter was addressed to Capt. Holt. It was in reply to a letter from the latter to appellant, one inquiry of which was: "What amount of money would clean up all the indebtedness against the company so there would be no further sums to raise?" In his letter of February 27, 1908, to Capt. Holt, appellant stated:

"Forty thousand dollars will clean up all the indebtedness against the company and there will be no further sum for me to raise. * * *.

"As I advised you when here, I shall not need more than $15,000.00 for the next possibly eight months, in which time I am perfectly confident that the property will be sold at a handsome profit. Failing in this, however, there will be no trouble in the world in securing whatever other moneys we may need, even should it become necessary to pay off the entire indebtedness. * * *

"Since writing the above it has occurred to me that $12,000 will answer my purposes until you get back from California. Should the property, however, not have been sold by that time, and I find it necessary to raise a few thousand more, we can arrange the same after you return or you might arrange for me to get it if I wish while you are gone, as I really prefer not to take more than $12,000 at this time. * * *

"I cut out 1,000 acres in fee in order to reduce our total money requirements."

This letter was written before the resolution of February 29, 1908, of board of directors was passed making the said salary from May 1, 1907, an expense of the corporation and hence an indebtedness of it. Prior to that time appellant had been rendering valuable services to the corporation without any salary compensation. It was on the motion of W. E. Harris that the resolution of February 29, 1908, was adopted, the directors thinking then that this salary expense should be made an indebtedness of the corporation. Hence there was no misrepresentation by appellant of the indebtedness of the corporation in his letter of February 27, 1908.

Appellant wrote Capt. Holt, under date February 29, 1908, as follows:

"As I told you, a friend of mine and myself are now taking care of $14,000 of this debt, so we won't have to raise very much more even if the property is not sold in a year, while I confidently believe now that it will be sold in ninety days. * * *

"P. S. Think now that I will be able to give you a definite answer not later than Tuesday next. If you join me, would want you to come to Richmond and close the matter before you leave for the West."

Again, under date March 1, 1908, after the last-named resolution was passed, appellant wrote Capt. Holt:

"From my statement you will observe that fully 70% of the property is paid for. Several thousand acres have been paid for in full, while of the average cost of the entire property, including attorney's fees, perfecting titles, surveying each and every tract, maps, reports, making coal openings all over the property, in other words proving the property, over an area of some 25 or 30 miles, costing alone some $1,400 to $1,500 and maybe more, but money well spent, because it is now proven to be a magnificent coal bed, second to none in quantity or quality. * * * Now I have endeavored to make myself perfectly and clearly under-

stood. Want you to know everything, could not, would not, keep back anything for my life, much less a few dollars, so I respectfully request that you and your friends come to Richmond at once and look into everything for yourselves, and if they are not to the letter as I have stated, then you can't put one dollar into this proposition. I particularly request you to come, Captain, before you leave for the West, and bring your friends with you."

It does not appear that there was any misrepresentation in these two letters of February 29 and March 1, 1908, concerning the salary expense to February 29, 1908, as an indebtedness of the corporation or cost of its property. It is true appellant does not mention expressly the salary expense, but he urges that Capt. Holt and his friends "come to Richmond at once and look into everything for themselves," and he added, "I particularly request you to come, Captain, before you leave for the West, and bring your friends with you."

Two statements, one of bills payable as of March 1, 1908, the other of the condition of said corporation at the close of business February 29, 1908, are filed with the bill as "Exhibit A," marked in record, pp. 130 and 128, as "Complainant's No. 20" and "Complainant's No. 19," which do not show any indebtedness of the corporation to appellant for salary—but it appears from Mr. Witz's deposition that it is not clear that these statements were furnished him until June, 1908, after the "sale contract" was entered into. However, in view of the fact that a trip to Richmond and looking "into everything for themselves" would have disclosed the February 29, 1908, resolution, and especially in view of the specific knowledge on the part of Mr. Witz, acting then for himself and as agent for Capt. Holt, subsequently acquired, as above stated, of the existence of the resolution of February 29, 1908, before the "sale contract" was entered into, the express recognition of the existence

35

of that resolution in the "pooling" agreement, contemporaneous with the "sale contract" and hence the recognition of said salary to February 29, 1908, as a legitimate expense of the corporation, the authorization of the continuance of such expense by such "pooling" agreement from February 29, 1908, to February 28, 1909; and the subsequent authorization of a like continuance from February 28, 1909, to February 28, 1910, or until sale of the company's property, by the resolution of board of directors of April 1, 1909, in which Mr. Witz participated as above noted—which salary expense appellant ceased to draw on October 4, 1909—we do not think there was any action of appellant which could have misled Capt. Holt or Mr. Witz, and hence which could operate as an estoppel against appellant as to such salary item of expense of the corporation.

The evidence in the case shows that if this salary item was a proper expense of the corporation "incident to the successful carrying out of the purposes of the said corporation," the *input* made by appellant to cover same was necessary, as the corporation was not in funds to meet same and its other obligations up to October 4, 1909, when such input for salary expense ceased.

This salary expense having been treated by the corporation, in effect, as "a necessary expense attendant upon the acquisition of the said lands of said defendant company," and having been so recognized subsequently by Capt. Holt and Mr. Witz, as aforesaid, we think the decree complained of was erroneous in holding to the contrary.

We come now to consider the remaining questions before us in the case, namely:

2. Was the $1,088, item "(b)" above referred to, properly held by the court below to be an input of appellant into said corporation, which he is entitled to have computed in the calculation of the amount of common stock of such corporation to which he is entitled?

We think it was.

On February 7, 1909, appellant presented the bill for this $1,088 to the board of directors of the company, and the following resolution was adopted by such board, of which Mr. Witz was a member, on this subject:

"It was moved and seconded that the bill of W. M. Cary for office rent and stenographers' hire, amounting to ten hundred and eighty-eight dollars ($1,088.00) be paid, and that preferred stock be issued to him in satisfaction of said bill. The motion was unanimously adopted."

This is satisfactory evidence that such expenses were proper "expenses incident to the successful carrying out of the purposes of said corporation," and hence fell within the obligation of appellant as to input of money to defray same, if the situation was such at the time of the input by appellant to defray same that such input was then necessary.

This input of appellant on account of meeting and defraying such expenses was made February 27, 1909, as appears from record, p. 191. Such input was unquestionably necessary to defray such expenses at that time as the record shows. However, it seems that the appellant made an input of money into the treasury of the company of $1,000 on October 4, 1909, for which preferred stock was issued to him. This is a separate and distinct matter from the $1,088 item as to which cross-assignment of error is made before us, as we understand it. But if we were to consider the $1,000 input on October 4, 1909, involved in such cross-assignment of error, the following seem to be the facts as to the need for such input at that time:

In reply to inquiry as to such $1,000 input, appellant testified:

"Yes, sir, I made it because on that date, October 4, 1909, the company had outstanding obligations due and payable amounting to, principal and interest, between twenty-one and twenty-two thousand dollars, for three-fourths of

which I was personally liable under the March 6, 1908, contract with the Harrises; * * * I felt it my duty to make provision for whatever demands might come upon the company on account of these past due and payable obligations; and so, whenever I had any money to spare, which I felt would contribute to that end, I put it to the credit of the company's account in bank and received credit upon the books of the company."

While it is true that in November, 1909, purchasers of property from said corporation paid to it a very large sum of money on an option not exercised until then, and it turned out that appellant might have waited until then for funds to meet existing obligations of the corporation, and if he had not paid in the last $1,000 of input by him into the treasury of the corporation it would not have been sued on its obligations, still the fact was that appellant had no means of knowing on October 4 that such option would be exercised or that the corporation would be in funds from any other source to meet obligations then existing of between $21,000 and $22,000, for nearly all of which appellant's obligation as to input required him to make input into the treasury of the company as he was behind in his input to the extent of some $18,800 of his proportion of three-fourths of needed capital—the Harrises having made an input of $34,999 under their obligation to contribute one-fourth of such capital and appellant having contributed only $101,200, not including such $1,000, but including said salary amount of $5,050 and said $1,088 item; he had $1,000 personal funds available for application to that small extent to such obligation, and made the input of it on that date in good faith, with no thought or purpose of unduly swelling his proportion of the common stock of the company; and we, therefore, think the court below was clearly right in holding as it did in effect that appellant is entitled to have this $1,000 input as well as said $1,088

input computed in the calculation of the proportion of common stock to which he is entitled.

3. We come now to the remaining assignment of cross-error, which involves the question whether there was a mistake in figures by which the total input of appellant was ascertained to be $102,200.

In the brief for appellees a tabulation of figures is given, taken from the cross-examination of Mr. Sutton, the accountant, exclusive of appellant's salary, as follows:

| | | |
|---|---:|---:|
| Paid on account of lands and notes given for deferred payments on lands by the company | $100,322 | 16 |
| Paid on interest account | 2,884 | 19 |
| Paid for expenses of every kind from the organization of the company, including office rent, stenographers' salary, etc., but excluding any salary to W. M. Cary (*and including also the $1,088 item above mentioned to Cary*)—(Italics supplied, and counsel is in error as it seems to us in statement contained in language *italicised* as presently pointed out) | 14,298 | 84 |

Total .......... $117,505 19

| | | |
|---|---:|---:|
| During the same time the Harrises had contributed $35,005 (correct amount per p. 196 record) | 34,999 00 | |
| Income from sources other than Harrises and Cary | 5,786 50 | 40,785 50 |

(NOTE.—The tabulated statement referred to also deducts $2,039.10 cash on hand, but clearly this should not be done).

| | | |
|---|---:|---:|
| Total input by appellant per these figures.... | $ 76,719 | 69 |
| (Not including his salary item of $5,050.00). | | |
| Add such salary item...................... | 5,050 | 00 |
| | $81,769 | 69 |
| Add also the October 4, 1909, $1,000 input not included in figures given in said tabulated statement ........................... | 1,000 | 00 |

Comparing this witness' statement on p. 196 of record with those on pp. 188 and 144 of record, there is some discrepancy in totals which the record does not give sufficient details to check out, but it is evident that the foregoing figures are taken from the "cash book" of the company.

This witness testifies that to those figures should be added the following items of input of appellant credited on the "Journal" of the company and not on the "cash book," viz.:

| | | | |
|---|---:|---:|---:|
| Ratliff land ................... | $11,404 | 93 | |
| McCue input, principal.......... | 5,156 | 28 | |
| interest .......... | 300 | 00 | |
| Expense before opening of books of company ................ | 442 | 00 | |
| Above named item of ........... | 1,088 | 00 | 18,391 21 |

| | | |
|---|---:|---:|
| Total input of appellant arrived at in this way. | $101,160 | 90 |
| Instead of................$102,200 00 as per itemized statement of witness, Sutton, pp. 189-90 of record. | | |
| An error (to balance) of | 1,039 | 10 |
| | $102,200 00 | $102,200 00 |

| | | |
|---|---|---|
| However, this witness furnishes said itemized statement which totals said input of $102,200.00. He also testifies, on p. 189 record, that appellant's input, as shown by said *cash book* totals......................... | $ 83,808 | 79 |
| (a discrepancy of $1,039.10 from the total of $82,769.69 above ascertained by dealing with the items given in this witness' deposition on cross-examination, p. 196 record). He positively testifies, however, on p. 189 of record, that the said *journal* entries are to be added to the $83,808.79 input shown by said "cash book" ................................... | 18,391 | 21 |
| Making a total of................ | $102,200 | 00 |

In the condition of the record before us, therefore, we cannot say that there has been an error in figures made in the total of $102,200 as the input of appellant into said company, by which the denominator of the fraction is to be ascertained, which fixes his proportion of the common stock of the said company and also the proportion of such stock to which appellees are entitled, and such $102,200 must be held to be the correct denominator of such fraction, and the cross-errors assigned as aforesaid cannot be sustained.

Because of its holding above referred to, however, with respect to said $5,050.00 input of appellant, the decree of the court below complained of must be reversed, for the reasons stated above, and the cause is remanded to the law and equity court for further proceedings therein not in conflict with this opinion.

*Reversed.*