[Civil No. 2809. Filed January 19, 1931.]

[295 Pac. 305.]

THE INDUSTRIAL COMMISSION OF ARIZONA, Appellant, v. THE ARIZONA POWER COMPANY, a Corporation, Appellee.

Mr. K. Berry Peterson, Attorney General, Mr. John J. Taheny, Mr. H. A. Elliott and Messrs. Elliott & Shimmel, for Appellant.

Messrs. Cornick & Crable, for Appellee.

ROSS, J.—On August 20, 1926, the Industrial Commission of Arizona insured the Arizona Power Company against its entire compensation liability under the Workmen's Compensation Act for the period to and including December 31, 1926, and received from the insured as initial payment on premium the sum of $4,134. Claiming under the terms

and conditions of the policy there had accrued during said period premiums amounting to $16,555.38, the commission demanded of the insured the difference between these two sums, to wit, $12,421.38, and payment being refused this action was begun to recover said sum.

The policy is what is known and referred to as a self-rating policy. It is the same form of policy employed by the commission to insure employers in the state compensation fund, except the method adopted to ascertain the amount of the premiums to be paid. Such method is expressed in a typewritten indorsement on the policy in words and figures as follows:

"Except as regards the loading for expense of administration and for catastrophe and excess losses, the rate or rates of premium for this policy shall be subject to the experience rating plan of The Industrial Commission of Arizona on a 100 per cent. self-rating basis, i. e., the rate or rates shall be modified upward or downward in direct proportion to the ratio of the actual loss experience (exclusive of catastrophe and excess losses) to the expected loss experience (exclusive of catastrophe and excess losses).

"The initial experience period shall extend from the date of inception of this policy to and including December 31st, 1926.

"Every succeeding calendar year shall be an experience period.

"In the event of cancellation during an experience period, the latter shall terminate upon the effective date of cancellation.

"Every modified rate shall be retroactively effective, and shall apply to the entire experience period upon which it is predicated."

During the period of insurance, claims for compensation to employees of defendant were allowed and actually paid by the commission out of the state compensation fund in the sum of $72.08; and in addition claims by a wife and child for compensation for death of a husband and father from injuries received dur-

ing said period were allowed, payable out of such fund: To the wife (24 years old) at $70 per month until death or remarriage, and $1,680 in cash upon re marriage; and to the child (1½ years old) $30 per month until she attains the age· of 18 years or sooner dies or marries.

Applying the terms of the contract of insurance to these facts, the commission, using its own statement, found the premiums to be as follows:

"The Arizona Power Company had five accidents during the period from August 20th to .December 31st; two of which were compensable. In one case the total cost amounted to $72.08. The other was a case of accident resulting in the death of A. F. Leavitt; the present value of that case computed on expectancy and remarriage tables, discounted at 3½%, gives a total payment to both the wife and child of the deceased of $15,485.74.

"Under their policy of insurance with us, the Arizona Power Company agree to pay premium on a rate which shall be retroactively determined by their actual cost of accidents, exclusive of catastrophe or excess losses. The figure of $14,000.00 has been established as the minimum above which the cost of any accidents, or series of accidents, arising out of one event will be distributed from the excess fund set up out of the 15% additional cost based on their accidents. Consequently, the cost of their accidents for the purpose of establishing a rate has been reduced from $15,557.82 to $14,072.08. Inasmuch as this now represents 85% of the total premium chargeable, we arrive at a figure of $16,555.38, as the total premium due under their policy, which deducting the $4,134.00 advance premium which has been paid leaves a balance due The Industrial Commission of $12,421.38."

There is no question but that the premiums were calculated by the commission in accordance with "the experience rating plan of The Industrial Commission of Arizona." Defendant admits its liability under the policy for compensation actually paid by the commission during the insurance period, but denies the

right of the commission to commute the installments payable to the wife and child and to include the commuted payment as part of the actual loss experience. The defendant figures the earned premium for the period from August 20th to December 31st to be $72.08, the compensation actually paid by the commission plus the 15 per cent. loading charge, or a total of $82.88.

Defendant says, and this is one of its defenses, that it had no knowledge of the commission's "experience rating plan" and that the reference thereto in the written indorsement on policy was not sufficient to put it on notice that there was such a plan. From this premise it argues that there was no meeting of minds and therefore no contract.

It also contends that the "actual loss experience," as used in policy, means, and was so understood by it, losses paid during insurance period, and does not include losses incurred but to be paid in the future, such as the compensation to the wife and child.

Defendant also contends that the Compensation Act gives to the employer the right to pay compensation to the surviving dependents of the deceased in installments over a period of years, and that it is entitled to have and exercise such rights, and that any contract depriving it of that right is discriminatory, unconstitutional, and void.

It also contends that the self-rating policy is not one of the policies authorized by the Compensation Act, and that therefore it is *ultra vires* the powers of the commission and void.

The trial court sustained the contentions of the defendant and, in accordance with the defendant's prayer, ordered the commission to make an accounting, and upon such accounting being made entered judgment against the commission for a balance after deducting $72.08 and partial payments made to the widow and child up to July 26, 1928, such judgment

being for the sum of $2,189.33. The commission appeals.

We will consider defendant's contentions in the order as above stated.

The commission's self-rating plan was a very real and important part of the insurance contract, for upon such plan the premiums were to be calculated and ascertained. This is what is said in the indorsement upon the policy, made a part thereof: " . . . The rate or rates of premium for this policy shall be subject to the experience rating plan of The Industrial Commission of Arizona." Unless the defendant gave its consent to the incorporation of the self-rating plan into the contract by reference, such plan is no part of the contract, but if it did consent thereto, the defendant is presumed to know its full purport and meaning, even though as a fact it did not. It has long been settled, without a dissenting voice, that parties may incorporate into agreements by mere reference other writings or agreements or records and thereby make the latter an essential part of their contract. If one writing refers to another, the intention of the parties is to be gathered from the two instruments. We cite a few of the many authorities on this rule: *Gill* v. *Manhattan Life Ins. Co.*, 11 Ariz. 232, 95 Pac. 89; *Whittlesey* v. *Herbrand Co.*, 217 Mich. 625, 187 N. W. 279; *Short* v. *Van Dyke,* 50 Minn. 286, 52 N. W. 643; *Cary* v. *Holt's Executors*, 120 Va. 261, 91 S. E. 188; *Aetna Life Ins. Co.* v. *Bradford,* 45 Okl. 70, Ann. Cas. 1918C 373, 145 Pac. 316; *Green* v. *National Casualty Co.*, 87 Wash. 237, 151 Pac. 509; *Beedy* v. *San Mateo Hotel Co.,* 27 Cal. App. 653, 150 Pac. 810.

On March 8, 1926, the commission adopted and spread upon its minutes an "Outline of the Experience Rating Plan . . . Applicable to Employers Insuring with the Commission on a Self-Rating Basis." When the present contract was entered into such

"outline" was a public record, open to inspection by defendant. If before entering upon negotiations for self-insurance defendant was without knowledge of such record, it learned thereof before the contract was executed, for the contract itself referred to the self-rating plan as the basis of rate fixing.

It is said in 32 Corpus Juris, 1164, section 275:

"Reasonable rules and regulations of the company for the conduct of its business are as binding upon the company and insured dealing with the company after notice thereof, as if they had been declared in express terms to be a part of the contract."

We think the self-rating plan of the commission should be treated as actually inserted at length into the contract of insurance and together with the latter construed as the contract made by the parties.

Indeed, we are persuaded that defendant's chief, and perhaps only, grievance against the contract of insurance grows out of the application of the self-rating plan in arriving at the earned premium. The discrepancy in what defendant admits owing and what plaintiff claims is very great. Why parties of admitted experience and intelligence should construe the contract, one as calling for an earned premium of $82.88 and the other of an earned premium of $16,555.38, is cause for wonder. It all comes from the fact that their premises are different. Defendant starts with the premise that the premium should equal but not exceed the compensation actually paid by the commission to its employees during the insurance period, plus a loading charge of 15 per cent. to cover catastrophe and excess losses and overhead expenses of the commission, and from that premise concludes that since the commission actually paid out only $72.08 by way of compensation prior to December 31st, that sum plus 15 per cent. was the amount of earned premium. It excludes from its calculations the awards made to the 24 year old widow and the

1½ year old child for the death of the husband and father during the period of insurance, payable to the wife until death or remarriage, with a commuted value of $1,680 upon remarriage, and to the child until 18 years old unless she sooner dies or marries; whereas the commission includes in its computation the commuted cash value of these awards in arriving at the earned premium.

It is provided by the experience self-rating plan, adopted by the commission on March 8, 1926, as follows:

"VII. The actual loss experience of the insured is the total amount of compensation paid or payable by the Commission during any experience period, plus the present value of all compensation payable thereafter by the Commission, by reason of all accidents occurring during such experience period and imposing liability for such payment upon the Commission by virtue of the policy issued to the insured.

"VIII. The present value of the compensation payable subsequent to the experience period during which such accidents shall have occurred shall be determined on the basis of the expectancy tables adopted by the Commission, and, except as otherwise provided herein, without regard to any personal condition of the beneficiary other than his or her age, sex or conjugal condition."

Pursuant to the above provisions VII and VIII of the self-rating plan, on July 1, 1926, the commission adopted life and remarriage expectancy tables for widows, and life and marriage expectancy tables for minor children, and the present values of the awards to the widow and minor child were arrived at under such tables. Thus, under the terms of the contract it was agreed that awards payable in future installments could be commuted to one cash payment and satisfied by the insured, if less than the sum fixed as a maximum loss for a single accident, paying such commuted sum, or if greater by paying the maximum for

a single accident, under the following rule in the self-rating plan adopted by the commission:

"XIV. Catastrophe and excess losses during any experience period are the portions of every loss, as defined herein, in excess of a certain figure to be named by resolution of the Commission at the close of the experience period. The figure named will be such figure, not in excess of the reinsurance retention of the Commission at the time of any accident giving rise to any such loss, as will, having due regard to the upbuilding of the catastrophe surplus, result in the distribution of the greatest number of such losses."

The maximum loss for a single accident was fixed by the commission at the end of the initial experience period at $14,000, which, under the contract, was defendant's "actual loss experience," and not $15,485.74, the commuted value of awards to the wife and child.

Defendant contends that if the contract is construed as requiring it to pay the commuted cash value of the awards to the wife and child, it is discriminatory, unconstitutional, and void. If the awards had been against the defendant as a self-insurer, we have no doubt its contention would be right. But insurance in the state compensation fund relieves the employer of all obligations except the one of paying the premiums. Having done that, the awards are against the state compensation fund. Awards to the wife and child payable in monthly installments will continue until the happening of the contingency or contingencies upon which they are based, but will be paid by the commission out of the state compensation fund and not by the defendant. The state compensation fund, or the commission, is the debtor and must perform the judgment by continuing to make the installment payments as provided in the judgment or award. If the defendant were a self-insurer, the awards would be against it, or if it were indemni-

fied by a private insurance company the awards would be against the latter, in neither of which cases could the awards be commuted except upon the consent of the judgment debtor. Of course, a debtor may always compose his debts, either according to terms agreed to before they accrue or upon terms after their accrual. The decisions from New York, relied upon by defendant, as sustaining its contention, go no further than to hold that when awards are of future payments the commission cannot compel the judgment debtor to pay in a lump sum the present value thereof. *Adams* v. *New York, O. & W. Ry. Co.,* 175 App. Div. 714, 161 N. Y. Supp. 919; *Sperduto* v. *New York City Interborough Ry. Co.,* 186 App. Div. 145, 173 N. Y. Supp. 834. These cases were clearly decided correctly and upon sound principles, but are not in point here.

Under the contract here, defendant has not agreed to pay awards presently due, or due in the future, but has agreed to pay premiums for insurance in the state compensation fund, such premiums to be computed according to a formula agreed upon in advance.

The negotiations between the parties leading up to the execution of the policy were carried on both by correspondence and oral conversations. The Compensation Act (Laws 1925, chap. 83, p. 345) had but recently gone into effect, *Alabam's Freight Co.* v. *Hunt,* 29 Ariz. 419, 242 Pac. 658; Laws 1927, p. 527), and the different kinds of insurance therein provided for, except old line companies, so far as the state industries and the commission were concerned, were in the experimental stage. The defendant was engaged in the production, distribution, and sale of electric power, its annual gross revenues amounting to about $800,000 and its pay-roll to about $200,000. Naturally defendant was desirous of securing indemnity against loss as cheaply as possible. Accordingly, it wrote to the commission through its executive officers

for information. The letters from the commission were devoted to explaining straight insurance in the state compensation fund and self-rating insurance in said fund. Defendant now insists that these letters between the parties constitute or color the contract. We have carefully considered the letters exchanged and fail to find anything therein at variance with the terms of the contract as finally executed. However, the law is well settled that the negotiations, proposals, and conversations leading up to the execution of the contract were not competent to contradict or vary its terms, unless there exist some ambiguity therein. 1 Joyce on Law of Insurance, second edition, section 181, says:

"All prior negotiations, proposals and conversations are considered waived or merged in this written contract. And no rule is better settled than that parol evidence is inadmissible to vary or control the plain and unambiguous terms of a written contract of insurance."

In a letter to the commission, after the expiration of the insurance period, defendant's president stated:

"It is my understanding that at the end of the experienced period, namely, December 31, 1926, you figure up the losses which you have paid on our account during the term of this policy, and return to us any excess of advanced premium over the amount of actual cost, if the actual cost exceeds the premium we send you a further payment to cover same."

Answering this letter the commission stated:

"Your understanding of the plan of insurance, as indicated by your letter, is correct. It is not necessary to have any additional locations of work specified on the policy. The policy covers all your operations in Arizona, whether or not the location is specified."

The most that these letters show is that both parties misconstrued the contract after it had been fully executed; but, after a careful analysis of their con-

tents, one is not so sure of that. The commission doubtless was thinking of the terms "losses" and "actual cost" used in defendant's letter as meaning the same thing as "actual loss experience" mentioned in the policy. At all events, defendant was not misled or harmed by the admission of the commission, even if it be given the force and effect contended for by defendant.

Finally, is the contract of insurance *ultra vires,* the powers of the commission, and if so, is the defendant estopped from taking advantage thereof after receiving the benefits of its protection? The answering of this double question is not without its difficulties. The solution of the first part of the question must be found in the compensation act (chapter 83, Laws 1925; Rev. Code 1928, art. 5, chap. 24, §§ 1391–1457). Our references will be to chapter 83, Laws 1925, including also corresponding sections of the Revised Code in parentheses.

Section 48 (1422) requires private employers to secure compensation to their employees in one of the following ways: (1) In the state compensation fund; (2) with a stock company or mutual association authorized by law to transact such business; or (3) by qualifying with the approval of the commission to pay direct compensation to employees, that is, a self-insurer. We are not interested in the last two kinds of insurance, but only in the first. Defendant chose to pay the commission its premiums and have it take care of all compensation out of the compensation fund.

Section 32 (1413) provides for the classification by the commission of employments according to hazards and the fixing and grading of rates of premiums to be charged for different classes, based upon the total pay-roll and number of employees, and that such rates be the lowest possible consistent with the maintenance of a solvent compensation fund and the

creation of a surplus and reserve; makes it the duty of the commission to ascertain the "actual loss experience" of employers periodically, and to adjust the rates of premiums therein so that the assets of the compensation fund shall equal its liabilities, such liabilities to include the necessary reserves and the sum of $100,000 for catastrophe hazard; and provides that, if at any time the assets in any particular class exceed the liabilities as defined, the commission shall either allow a credit or declare a cash dividend to employers insured in the fund.

Section 34 (1411) and the first sentence of section 35 (1412) read as follows:

"Section 34. Contracts as to Insurance. — The commission may, in its official name, make contracts of insurance as herein provided, and such other contracts relating to the state compensation fund as are authorized or permitted under the provisions of this act. Such contracts of insurance may include and cover the entire underlying liability of employers insured in the state compensation fund so that such employers may be fully protected, not only for all compensation claims, but for all liability claims whatsoever by employees or the dependents or heirs of killed employees, including the cost of defense in the event of suit.

"Section 35. Policy of Insurance. Payment of Premiums.—1. Every employer insuring in the state compensation fund shall receive from the commission a contract or policy of insurance in a form to be approved by the state commission."

It is contended by the defendant that under the above provisions the commission has no right or power to fix premiums except in the manner provided in section 32 (1413). Plaintiff contends that these provisions are broad enough to authorize the commission to write the self-rating policy. There is a wide difference in a policy wherein the premiums are determined on the basis of classification and rates in accordance with the risks as provided in section 32

(1413) and a policy wherein the premium is determined on the self-rating plan. Under the former the premium is determined in advance of losses, upon the basis of the probable loss, and under the latter the premium is determined after the expiration of the insurance period, upon a basis not identical with the loss experience but approximating such loss experience except catastrophe losses. The broad powers given the commission under sections 30 (1410), 31 (1410), 34 (1411) and 35 (1412), to make contracts concerning the compensation fund, do not extend to contracts of insurance, for such contracts can be made only "as herein provided." Section 34 (1411). The commission is an agency of the state, created and maintained for the purpose of administering certain of the state's sovereign powers, and must proceed and act according to legislative authority as expressed or necessarily implied. Where the legislature has provided the terms and conditions of insurance policies the commission may issue, it seems to us very doubtful if any other kind may be legally issued by the commission. The general powers vested in the commission to make contracts concerning the compensation fund have reference to other contracts than policies of insurance. The terms and conditions of such "other contracts" the commission no doubt may supply if not inconsistent with the provisions of the statute. Since the manner of computing the premiums for insurance in the compensation fund is stated in the act, that manner, we take it, is exclusive. The self-rating policy is not one authorized by the act.

Defendant secured through the policy compensation to its employees. The commission actually performed its part of the contract by paying, or assuming to pay, all compensation that accrued during the insurance period. The awards to the wife and child for the death of their husband and father

are against the compensation fund and not the defendant. The period for revising such award or judgment as an allowance against the defendant has long since passed, and its enforcement, except as against the compensation fund, would involve many doubtful and complicated questions. In addition, defendant, by virtue of the policy, secured immunity from any action for damages by its employees at common law or under the employers' liability law, free from the defenses of assumption of risk and contributory negligence. Section 62 (1433). Having received the protection and immunity detailed, the defendant ought now to perform its part of the contract. It has been greatly benefited and the state compensation fund to the extent of such benefit depleted. Common ordinary equity and justice, unless there is some insuperable barrier thereto, require of the defendant, it seems to us, the fulfillment of its part of the contract. The contract is not against public policy, immoral or forbidden by law. The commission is authorized to write insurance and it was therefore exercising a statutory authority when it wrote the policy for defendant. At most, the commission misinterpreted the extent of its powers and deviated from the form of policy prescribed. It exercised a rightful power in a wrong way. It was, however, acting within the scope of its authority when it wrote the policy. The policy accomplished the object and purpose for which it was written. It authorized the commission, as the law prescribed, to pay and assume losses sustained by the defendant.

We have found no cases in which the exact question is involved, but the agency of the commission to issue policies of insurance in the compensation fund is comparable to the principles that govern municipal contracts entered into by the agents of the municipality. Many cases are found in the books holding that one dealing with a municipality under an irregular, insufficient or defective contract cannot after re-

ceiving the benefits of the contract set up as a defense thereto the lack of authority or power in 'the agent to make it. The principles upon which the rule is founded are well stated in *City of St. Louis* v. *Davidson,* 102 Mo. 149, 22 Am. St. Rep. 764, 14 S. W. 825, 826, as follows:

"It will have been observed that the charter of the city while it does not permit, yet does not prohibit, the making of such a contract as the one before us, so that, although the contract is *ultra vires* the corporation, yet it is not illegal, because not prohibited by the charter. This is a distinction clearly marked out by the authorities. 2 Dill. Mun. Corp. (4th Ed.) § 936; *McDonald* v. *Mayor,* 68 N. Y. 23 [23 Am. Rep. 144]; Bigelow, Estop. (5th Ed.) 685. And though a city might successfully interpose the plea of *ultra vires* when sued upon a contract, yet it does not thence follow that a party who contracted with such city can, when sued on the contract, successfully interpose 'the plea of incapacity on the part of the city to make such a contract, such contract not being illegal in the sense already indicated. In instances of this kind, 'the plea of legal disability of the opposite contracting party is as much out of the power of a defendant to make as would be a plea of the minority of the other party in similar circumstances, something of which no one can take advantage himself, except the party making it. Bigelow, Estop. (5th Ed.) 465; *Oregonian Ry. Co.* v. *Oregon Ry. & Nav. Co.,* [C. C.] 10 Sawy. 464, 22 Fed. 245, 23 Fed. 232. But, upon a yet broader ground, the defense set up in the answers cannot be maintained. The contract was not prohibited by law. The principal in that contract has derived benefits under it. He cannot retain those benefits and repudiate the source from which they spring by denying the validity of the contract in which they originated. In short, he is estopped to grasp the benefits of 'that contract with one eager hand, while thrusting aside its burdens with the other.

"The principle here asserted is one promotive of fair dealing, which is the basis of estoppels, and it is good law, as is exemplified by many adjudications."

O'ther cases announcing the same principles are: *Bell* v. *Kirkland,* 102 Minn. 213, 120 Am. St. Rep. 621, 13 L. R. A. (N. S.) 793, 113 N. W. 271; *Board of Education* v. *Empire State Surety Co.,* 83 N. J. L. 293, 85 Atl. 223; *Mayor etc. of City of New York* v. *Sonneborn,* 113 N. Y. 423, 21 N. E. 121; *City of Belfast* v. *Belfast Water Co.,* 115 Me. 234, L. R. A. 1917B 908, 98 Atl. 738; *City of St. Paul* v. *Bielenberg,* 164 Minn. 72, 204 N. W. 544; *Perkins* v. *State,* 130 Miss. 512, 94 South. 460; McQuillin on Municipal Corporations, 2d ed., § 1276; Donnelly on Law of Public Contracts, § 59.

It seems to us that the principles announced in these cases have a peculiar application to the facts here.

In *Arizona Corporation Com.* v. *California Ins. Co.,* 28 Ariz. 128, 236 Pac. 460, 464, the question involved was the validity of a note and mortgage in excess of the indebtedness permitted by the corporation's charter, and we there said:

"The contract was not against morality nor against sound public policy nor violative of any rule of justice. It was void, if at all, only because it exceeded the limit provided by the statute. The plaintiff had fully performed and paid the consideration agreed upon for the note and mortgage, and the defendant had received the benefits thereof and, having received the fruits of the contract, it would be extremely unjust to permit it to escape payment."

We think the defendant is estopped to deny the validity of the contract.

The judgment of the lower court is reversed and the cause remanded, with directions that plaintiff have judgment as prayed for.

McALISTER, C. J., and LOCKWOOD, J., concur.