# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON

WHITE'S ELECTRIC, HEATING, )
AIR AND PLUMBING, )
)
    Plaintiff/Appellee, ) Madison Chancery No. 51088
)
v. )
)
LEWIS CONSTRUCTION COMPANY, ) Appeal No. 02A01-9803-CH-00064
a/k/a TOMMY LEWIS )
CONSTRUCTION COMPANY AND )
FRONTIER INSURANCE COMPANY, )
)
    Defendants/Appellants. )

**FILED**

**August 11, 1999**

**Cecil Crowson, Jr.
Appellate Court Clerk**

## APPEAL FROM THE CHANCERY COURT OF MADISON COUNTY
### AT JACKSON, TENNESSEE

### THE HONORABLE JOE C. MORRIS, CHANCELLOR

For the Plaintiff/Appellee:

Gerald B. Kirksey
J. Timothy Crenshaw
Brentwood, Tennessee

For the Defendants/Appellants:

Ralph D. Golden
Memphis, Tennessee

**AFFIRMED IN PART, REVERSED
IN PART, AND REMANDED**

HOLLY KIRBY LILLARD, J.

CONCURS:

ALAN E. HIGHERS, J.

DAVID R. FARMER, J.

**OPINION**

This is a construction contract case. The plaintiff subcontractor sued the general contractor and the general contractor's surety seeking unpaid contract payments and damages for delays in performance of the construction contract. The trial court awarded the plaintiff damages for breach of contract and for disruption and delay. We affirm in part, reverse in part, and remand.

Lewis Construction Company ("Lewis Construction") was the general contractor for a construction project with the Jackson Housing Authority ("JHA") to renovate public housing facilities in Jackson, Tennessee. The original contract between the JHA and Lewis Construction contained a project deadline of November 15, 1994, or 278 days. The prime contract deadline was subsequently extended by agreement to September 5, 1995. The project was to be completed in three separate phases, with Phase I to be completed before Phase II began and so forth. Frontier Insurance Company ("Frontier Insurance") served as Lewis Construction's surety on the project. Lewis Construction and Frontier Insurance will be referred to collectively as the Defendants. White's Electric, Heating, Air and Plumbing ("White's Plumbing") was the plumbing subcontractor for the construction project.

White's Plumbing submitted a bid proposal to Lewis Construction in the amount of $151,000. The proposal referenced the plans and specifications for the project contained in a project manual distributed by Lewis Construction to potential subcontractors. White's Plumbing's proposal was accepted by Lewis Construction on February 22, 1994. The subcontract between White's Plumbing and Lewis Construction provided that White's Plumbing would provide labor, supplies, and material for installation of water lines, sanitary vent lines, plumbing fixtures, and gas lines "per plans and specifications for Jackson Housing Authority Modernization Program." The subcontract provided that Lewis Construction was to pay White's Plumbing "per specifications." The subcontract did not contain a completion date.

White's Plumbing began work on the project on March 4, 1994, and completed its work on the project on April 18, 1995. Two change orders in the record showed that the parties increased the contract price by $1790, making the total due White's Plumbing under the contract $152,790. Lewis Construction paid White's Plumbing $138,651.34 under the subcontract, but withheld the $14,138.66 retainage.

White's Plumbing filed a lawsuit on October 13, 1995 against Lewis Construction and Frontier Insurance. The complaint alleged that Lewis Construction caused damages to White's Plumbing by delaying White's Plumbing's completion of its work on the project, thereby increasing White's Plumbing's costs and decreasing its profits. White's Plumbing asserted that Lewis Construction caused delay by failing to perform necessary site work and clean up, making changes in the normal sequence for completion of the work, and failing to coordinate the work of other subcontractors. White's Plumbing also alleged that Lewis Construction had refused to pay for work that White's Plumbing performed under various change orders to the subcontract. White's Plumbing contended that Lewis Construction violated the Prompt Pay Act, Tennessee Code Annotated § 66-34-101 to -703, by failing to pay White's Plumbing in a timely manner after it received payments from the JHA. White's Plumbing's claims against Frontier Insurance were based on the contractor's bond issued by Frontier Insurance for Lewis Construction, pursuant to Tennessee Code Annotated § 12-4-201. A copy of the bond was attached to White's Plumbing complaint. White's Plumbing sought $15,551 in unpaid contract payments and retainage, and $84,329 for delay, disruption and impact damages.

Lewis Construction and Frontier Insurance filed a joint answer. Frontier Insurance admitted that it was Lewis Construction's surety, but denied that it issued a contractor's bond to Lewis Construction pursuant to Tennessee Code Annotated § 12-4-201. The Defendants denied that Lewis Construction breached the subcontract with White's Plumbing, that Lewis Construction was responsible for any delays to the subcontract, or that Lewis Construction owed White's Plumbing any monies under the subcontract. The Defendants raised several affirmative defenses, including lack of subject matter jurisdiction, failure to state a claim on which relief could be granted, the statute of frauds, and failure to give timely notice of the claim as required by Tennessee Code Annotated § 12-4-205.

The Defendants later filed an amended answer in which they asserted the defense of unclean hands. The Defendants alleged that White's Plumbing committed the first material breach of the contract, and thus they were not liable to White's Plumbing for any damages. The Defendants also alleged that White's Plumbing was not properly licensed by the Tennessee Contractor's Licensing Board for the construction project, that White's Plumbing failed to mitigate its damages, and that White's Plumbing failed to pay required county and city business taxes and to obtain the required

2

county and city business licenses pursuant to Tennessee Code Annotated § 67-4-217. Finally, the Defendants asserted that White's Plumbing waived the claims set forth in its complaint.

The case was heard in a bench trial. Jerry White ("White"), the owner of White's Plumbing, testified that he understood the completion date for the subcontract to be November 15, 1994, based on the original completion date in the project manual and the contract between the JHA and Lewis Construction. White said that he calculated his bid based on his estimate of the materials needed and the plans and specifications for the job, including the completion date. He considered the completion date to be an important factor in preparing his bid because of his knowledge that both the general contractor and the subcontractors would be subject to liquidated damages if the project were not completed on time.

White testified that it is the general contractor's duty to coordinate the subcontractors on the project, and that Lewis Construction failed to do so. He explained that Lewis Construction never met with the subcontractors to let them know when to show up at the job site, nor did it provide the subcontractors with a schedule. White said that he would be told to begin work at one job site and then, a few days later, Lewis Construction would send White's Plumbing to another job site across town. He described the job site as "just chaos." He testified that he experienced delays and difficulties due to the large turnover in personnel under Lewis Construction's supervision, including twenty-four painters, twenty-two carpenters, fifty-one laborers, and six sheetrock finishers: "You didn't know from one day to the next who the next guy was. Every day you'd come in and you'd have to reintroduce yourself to the painter and tell him where you was and whether you had that lavatory hung, for him to paint behind it or not."

White also testified that sanitary conditions at the job site were unsatisfactory. He said that no commodes were provided at the work sites, and that consequently, his employees had to drive into town to use the restroom. White said that other workers at the site under Lewis Construction's supervision would pull the tape off the sealed bathtub drains and other drains his employees had to work on and use them as commodes.

White testified that he had not received any complaints about the quality of his work on the project or that he failed to provide the material, services, or supplies he was supposed to furnish under the subcontract. Based on the project manual, he understood his work to be warranted for one year, although the water heaters White's Plumbing installed came with a five-year warranty. He said

that he supplied Lewis Construction with the purchase tickets on the water heaters containing the warranty information, as required by the project manual, including the serial numbers. White asserted that he furnished the warranty parts for other plumbing materials directly to the JHA, as required by the project manual. An order form from Tennessee Pump and Supply Company was introduced showing that White's Plumbing ordered various maintenance parts on July 17, 1995. White testified that he sent in his Subcontractor Certificate and Release showing that he had paid for all of the parts and labor used in the project. Despite this, White asserted, he was not paid approximately $15,000 he was owed under the contract.

White also testified about several invoices totaling $1412.50 for work done that was not included in the subcontract, such as clearing bathtub drains, commodes, and a main water line clogged with construction debris and trash. These invoices were admitted as exhibits along with pictures showing the condition of the work site. White maintained that these repairs were not contemplated by the subcontract. He referred to page 15005-3 of the project manual, which states that "All drainage openings in floors, plumbing fixtures to remain, etc., are to be covered so as not to allow mortar, tile, etc., into the sanitary system." He testified that these drains were not covered by Lewis Construction, as required by the project manual, and that consequently they became clogged.

A superintendent for White's Plumbing on the project, Ricky Reasons, also testified that it is the general contractor's duty to coordinate the work on the site, and that Lewis Construction did not meet with subcontractors, provide schedules or plans, or provide any information telling White's Plumbing where it should be working at any given time. Reasons testified that Lewis Construction failed to have the sites cleaned up as required by the project manual. Consequently, Reasons said, White's Plumbing employees would have to spend time cleaning up before they could begin work. Reasons also testified that, because Lewis Construction failed to provide bathroom facilities as required by the project manual, the men working on the job site would untape the drains and use them as commodes, and that debris would also fall in the uncovered drains and clog them. It then fell to White's Plumbing to unclog the drains. Reasons also testified about the problems caused by the excessive turnover in personnel under Lewis Construction's supervision. Often, Reasons said, White's Plumbing would arrive at a site and find that portions of the project that had to be done before White's Plumbing could begin its work had not been completed.

4

Jerry White testified extensively about his damages caused by the delay in the completion of the contract. He said that he based his bid proposal on the information contained in the project manual, including the completion date, because it was the only information provided to him on which he could base his proposal. White testified that the extra twenty-two week delay on the project caused him to incur a service charge of $1578.54 to a vendor for late payment, additional operating expenses of $26,174.96, and additional labor expenses of $6599.50. Moreover, additional project management work cost $11,440 and additional superintendent work cost $6661.25. White calculated the cost of labor inefficiencies caused by the delay at $14,018.34 and miscellaneous expenses at $1000. White then added his lost profit of ten percent, or $6747.26, to the above figures and ten percent prejudgment interest of $21,918.60 to calculate his total delay and disruption damages at $96,138.45.

Bonnie White, Mr. White's wife, testified that she performed bookkeeping, secretarial, and scheduling duties for White's Plumbing. She also testified about the damages White's Plumbing suffered as a result of the delays. She explained that, when White's Plumbing prepared its bid on the project, its cost was calculated through November, 1994, and that expenses after that date caused by the delay had reduced its profit. She acknowledged that Lewis Construction paid White's Plumbing $32,000 for supplies, but testified that White's Plumbing incurred late fees because it owed approximately $70,000 to the vendor. She testified that the $14,018.34 claim for labor inefficiencies claimed by Jerry White in his testimony was calculated by multiplying two hours per day at the highest pay rate. These damages were to compensate White's Plumbing for time its employees spent doing such things as driving to the restroom, since Lewis Construction provided no bathroom facilities. White's Plumbing's claim for miscellaneous expenses in the amount of $1000 consisted of rental charges for items such as tools and a trailer that they had to keep at the job site, which otherwise could have been used at different jobs.

On cross examination, Bonnie White testified that White's Plumbing's total labor cost on the job, including the delay period, totaled $70,091.98. Bonnie White conceded that, when she calculated delay damages, she added up White's Plumbing's expenses from November, 1994 to April, 1995, rather than comparing the estimated cost to complete a task with the actual cost, and therefore made no determination of whether there was an actual increase in the cost of performing the work. Bonnie White acknowledged that she included the overhead of the business in White's

5

Plumbing's claim for operating expenses, even though White's Plumbing would have still incurred these expenses had it finished the project in November, 1994. She testified that the bid proposal included a percentage of White's Plumbing's overhead, but that the proposal included overhead only until November, 1994. She had not calculated the amount of overhead in the bid that was used up by November. Bonnie White conceded that she calculated the additional project manager expenses at eight hours per day during the delay period, even though the project manager spent at least some time working on other projects. She also acknowledged that the trailer and tools kept on site were not rented but were owned by White's Plumbing. She based the rental fee included in the delay damages on rental payments incurred in other jobs.

Several letters from the JHA to Lewis Construction were introduced into evidence to show that the JHA considered the delays to be Lewis Construction's fault. In response to a change order submitted by Lewis Construction requesting an extension, a memo from the JHA stated:

> Leaves the impressions [sic] to anyone reviewing the records that [Lewis Construction] is in some way entitled to a time extension...in reality there has been no documentation provided by [Lewis Construction] that would substantiate a time extension... The Authority has been more than lenient in allowing time extensions based on the limited documentation and rationale provided by [Lewis Construction].

> Many issues related to the change order remain unresolved...our records clearly show the facts related to the costs on the change orders...a [Lewis Construction] representative agreed to these changes in the field as they occurred....it certainly appears less than ethical that the company now refuses to stand by these agreements and is unable to provide any documentation or facts to substantiate their position. However, the person who agreed to the changes is no longer with the company for whatever reason.

> The Authority simply wishes to close out this program . . . We are expending a great deal of time attempting to accomplish contract close out without any results...as soon as we agree to a change order...the contractor refuses to sign or in most cases provides no response at all...there are an unbelievable number of letters to the contractor attempting to execute the final change order...maybe this is all a game....

> [M]ake it clear to Lewis [Construction] that these changes are not documented by fact but our concessions are based on our wish to close her out and say goodbye.

A letter dated February 8, 1995 from the JHA Project Manager to Lewis Construction indicated that Lewis Construction had started to Phase III of the project without completing Phases I and II, contrary to the project manual, and that therefore liquidated damages would be assessed against Lewis Construction. The letter stated, "Phase I and II appeared as though they could have been completed in a timely manner, well within the time you requested, but were left uncompleted for one reason or another. . . . It now appears at this point that Phase III is also falling behind schedule."

6

A second letter to Lewis Construction from the JHA Project Manager dated, April 3, 1995, reads: "[D]uring my field visits, it was evident that work was not progressing due to lack of manpower. It is important to the completion of this job that the required manpower be provided."

Wayne Nelson, the construction coordinator for Lewis Construction on the project, acknowledged that it was the general contractor's responsibility to coordinate the subcontractors and ready the site for them to perform their duties. Nelson did not remember a large turnover of painters or other employees, but said that he would consider a turnover of twenty-four painters during a project "very excessive." He admitted that schedules should have been provided to White's Plumbing under the subcontract, and did not know of any plans given to White's Plumbing showing a schedule for the project.

Nelson testified that Lewis Construction kept the job sites in good condition and even purchased tub liners in an attempt to keep debris from clogging the tubs. He admitted, however, that the liners were ineffective and that Lewis Construction had to remove them. He agreed that it was essential for the job site to be kept clean because small work areas would become cluttered and there would not be sufficient room in which to work. He acknowledged that, on some occasions, the job sites would not be cleaned prior to White's Plumbing arrival, but felt that the plumbers could still perform their work. Nelson testified that Lewis Construction tried to keep a bathroom in operating order at every site and disagreed with Mr. White's statement that employees would have to drive to a restroom. Nelson did not deny that workers used the bathtubs as toilets, but claimed that this use of the bathtubs by other construction workers was "typical" and was not unique to the JHA project.

Nelson conceded that the project had to jump from phase to phase in the beginning, but asserted that this was due to the JHA's inability to make decisions, such as the type of cabinet to order. This prevented the project from going forward as planned. Nelson recalled several delays, none of which were caused by Lewis Construction. For example, he testified about a delay caused by a shipper who lost some doors that then had to be remanufactured. Nelson testified that the JHA created delays because of its lengthy approval process for change orders and its issuance of multiple change orders, including those issued after the original completion date and those extending the completion date of the contract to September, 1995. Nelson testified that White's Plumbing caused some delay by incorrectly installing some vent pipes, although he later acknowledged that the majority of this delay was due to the inability of Lewis Construction to obtain a reinspection.

7

Nelson explained that, on many occasions during the project, when Lewis Construction experienced delays, White's Plumbing's employees would be on site but not performing any work. He indicated that, during one delay, White's Plumbing fulfilled a change order to install gas lines and ventilation to the hot water heaters. Nelson testified that he told White's Plumbing to remove its employees from the site during the delays and indicated that he would notify them when it was time for their phase of the work, but that White's Plumbing did not cooperate.

Nelson testified that a subcontractor is bound by the time frames in the contract between the general contractor and the owner. He asserted that, in the JHA project, the project manual allowed liquidated damages to be assessed against subcontractors that failed to complete the project on time. Nelson felt that it was appropriate for a subcontractor to consider the length of a contract in preparing its bid, in order to calculate how long its employees would be on the job and how long its equipment would be in use. Nelson admitted that White's Plumbing had complained to him of the delays and that White's Plumbing said that it would seek recovery for its losses. However, Nelson later testified he had no knowledge of any increase in White's Plumbing's costs caused by the delays. He denied receiving a notice of claim from White's Plumbing for extra expenses or damages.

The president of Lewis Construction, Linda Lewis, testified about Lewis Construction's reasons for withholding White's Plumbing's retainage of approximately $14,000. She testified that White's Plumbing had never provided documentation required by the project manual, such as time sheets or the five-year warranties on the fixtures it installed. She said that the invoices provided by White's Plumbing for the water heaters were insufficient because the project manual required information such as serial numbers on the warranty paperwork. Lewis Construction also withheld the retainage because White's Plumbing failed to provide certain maintenance supplies required by the project manual and did not provide a signed and notarized copy of its certificate of release of lien. Linda Lewis testified that, as of July 21, 1995, and July 27, 1995 the JHA had not yet received the maintenance parts. A letter from Lewis Construction to White's Plumbing dated July 27, 1995 was introduced into evidence which informed White's Plumbing that the JHA had not received the parts. Without this information, Linda Lewis explained, the JHA would not release the retainage to Lewis Construction so that Lewis Construction could pay subcontractors such as White's Plumbing. However, she admitted that the JHA paid Lewis Construction its full retainage in September, 1996, but after receiving that payment, Lewis Construction nevertheless did not pay White's Plumbing its

8

share. She did not dispute that White's Plumbing adequately performed all the physical work under the subcontract.

Linda Lewis testified that the delays to the project were caused by entities other than Lewis Construction. She recounted a delay of approximately one month due to an ice storm; a delay of approximately three months caused by the JHA's indecision on the color of the cabinets; a delay of approximately six weeks caused by incorrect blueprints prepared by a JHA engineer; a delay of several months caused by a door vendor; a short delay caused by a tenant who refused to vacate a unit Lewis Construction was to renovate; and a delay caused by the JHA's failure to timely provide furnaces. Linda Lewis said that change orders initiated by the JHA would take approximately one month to approve, which also caused considerable delays. The JHA granted Lewis Construction an extension of five weeks because of the weather and cabinet delays.

Linda Lewis disputed that White's Plumbing's late fees were due to Lewis Construction's failure to pay for materials. She testified that White's Plumbing was paid $32,000 for materials in July, 1994, but several months later Lewis Construction received two letters from Tennessee Pump Supply concerning a balance owed by White's Plumbing in the amount of $18,988 for supplies White's Plumbing ordered for the JHA project.

Linda Lewis testified that she repeatedly asked that White's Plumbing remove its employees from the job sites during delays because they were causing disruptions to other subcontractors. She said that, nevertheless, Jerry White kept an employee on the site. She estimated that the interference from White's Plumbing employees cost Lewis Construction approximately $8000, which was about twenty percent of Lewis Construction's payroll from December of 1994 to April of 1995.

Thomas Morris Rokitka, an employee for the electrical subcontractor on the JHA project, had no complaints about Nelson or Lewis Construction's coordination of the subcontractors for the project and could think of no delays caused by Lewis Construction. He also testified that bathroom facilities were available at the job sites and that he never had a problem finding a bathroom.

The trial court found that the original contract between White's Plumbing and Lewis Construction for $151,000 had been modified by the parties to the amount of $152,790. The trial court found that Lewis Construction had paid White's Plumbing $138,651.34 under the contract, but that Lewis Construction still owed White's Plumbing the balance due of $14,138.66. The trial court also awarded White's Plumbing $1412.50 for leak repairs it made. The trial court added these

9

amounts, plus interest in the amount of $4276.80, for a total award to White's Plumbing of $19,827.96 for breach of contract. The trial court's order did not include the specific findings of fact which were the basis for its conclusion that Lewis Construction breached the contract, such as whether Lewis failed to perform its duty to coordinate the project.

On the issue of delay damages, the trial court found that the original contract was for a duration of 278 days, but that the project lasted 22 weeks longer than expected, "result[ing] in additional labor costs, operating expenses, job expenses and lost profits" to White's Plumbing. Accordingly, the trial court awarded White's Plumbing $96,138.45 for delay damages, including prejudgment interest. Therefore, the total judgment to White's Plumbing against both Lewis Construction and Frontier Insurance was for $115,966.41. From this order, the Defendants now appeal.

On appeal, the Defendants argue that the trial court erred in finding liability against Frontier Insurance because no evidence was offered to prove its liability. They argue that, because White's Plumbing failed to give the statutory ninety-day notice required under Tennessee Code Annotated § 12-4-205 for a statutory bond, the trial court erred in not dismissing White's Plumbing's complaint. The Defendants assert that the evidence preponderates against the trial court's finding that Lewis Construction breached the contract. The Defendants also argue that the damages award was erroneous because the contract between the JHA and Lewis Construction could be unilaterally extended by the JHA and because White's Plumbing failed to mitigate its damages. In the alternative, the Defendants argue that the trial court did not correctly calculate the damages award for delay. White's Plumbing raises the additional issue of whether the bond issued by Frontier Insurance was properly made part of the record.

Since this case was tried by the trial court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. There is no presumption of correctness for questions of law. *See* Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

The Defendants first note that White's Plumbing never introduced Frontier Insurance's bond into evidence, and argue that the trial court was therefore precluded from determining Frontier Insurance's liability on the bond. Consequently, they maintain that it was improper for the trial court to assess liability against Frontier Insurance. White's Plumbing argues that the bond attached to its

10

complaint was properly in evidence. It notes that, while Frontier Insurance denied in its answer that the contractor's bond was issued pursuant to Tennessee Code Annotated § 12-4-201, it did not deny that the bond attached to White's Plumbing's complaint was the bond between Frontier Insurance and Lewis Construction. In the alternative, White's Plumbing requests that this Court remand the case to the trial court for correction of the record pursuant to Tennessee Code Annotated § 27-3-128, which provides:

> The court shall also, in all cases, where, in its opinion, complete justice cannot be had by reason of some defect in the record, want of proper parties, or oversight without culpable negligence, remand the cause to the court below for further proceedings, with proper directions to effectuate the objects of the order, and upon such terms as may be deemed right.

Tenn. Code Ann. § 27-3-128 (1980).

From the record, it is unclear whether the bond was admitted into evidence, although there appears to be no genuine dispute that the bond attached to the complaint is the bond issued by Frontier Insurance to Lewis Construction. This appears to be a proper case for the application of Tennessee Code Annotated § 27-3-128, and in the interest of justice, this case is remanded to the trial court for a determination of whether the bond attached to the complaint is the one issued by Frontier Insurance in the JHA project. If so, we find that White's Plumbing has provided sufficient evidence on which to base the liability of Frontier Insurance.

Next, the Defendants argue that the trial court erred in granting relief against Frontier Insurance under the bond because White's Plumbing failed to comply with Tennessee Code Annotated § 12-4-205, which requires the party suing to give a ninety-day notice of the suit to the other parties.[1] White's Plumbing responds that its complaint satisfied the statutory notice requirements and that Lewis Construction failed to carry its burden of showing that the notice did

---

[1] Tennessee Code Annotated § 12-4-205 provides certain requirements for notice of the claim:

> Such furnisher of labor or material, or such laborer, to secure the advantage of §§ 12-4-201 - 12-4-206, shall, after such labor or material is furnished, or such labor is done, and within ninety (90) days after the completion of such public work, give written notice by return receipt registered mail, or by personal delivery, either to the contractor who executed the bond, or to the public official who had charge of the letting or awarding of the contract; such written notice to set forth the nature, an itemized account of the material furnished or labor done, and the balance due therefor; and a description of the property improved; . . .

Tenn. Code Ann. § 12-4-205 (1992).

11

not meet the statutory requirements. In the alternative, White's Plumbing argues that the bond was common law rather than statutory, and that therefore the statutory notice requirements do not apply.

Tennessee Code Annotated §§ 12-4-201 through 12-4-208 "were created to provide protection for furnishers of labor and material on public works because these workmen are not protected by the mechanics' and materialmen's lien laws." *Wal-Board Supply Co. v. Daniels*, 629 S.W.2d 686, 687 (Tenn. App. 1981). In contracts involving public works, the contractor must execute a bond to the effect that the contractor will pay for all labor and materials used by the contractor. *See* Tenn. Code Ann. § 12-4-201 (Supp. 1998). A subcontractor may bring an action on the contractor's bond and obtain recovery in its own name. *See* Tenn. Code Ann. § 12-4-204 (1992). In order to bring an action on the bond, the subcontractor must provide written notice to the contractor or public official within ninety days after the completion of the public work. *See* Tenn. Code Ann. § 12-4-205 (1992). The written notice must set forth the nature of the claim, an account of material or labor used in the contract, the unpaid balance, and a description of the improved property. *See id.* Thus, Frontier Insurance argues that White's Plumbing's failure to provide such notice prevents White's Plumbing from recovering from Frontier Insurance under the bond.

Where the terms of the contractor's bond contain only the minimum requirements of the Tennessee Code provisions and no more, the bond is deemed statutory. *See Wal-Board*, 629 S.W.2d at 688. Where, however, the bond gives the claimant greater protection than that provided by the statute, the bond is deemed a common law bond. *See id.* For a statutory bond, the claimant must strictly comply with the notice requirements discussed above; for a common law bond, the claimant need only comply with the terms of the bond, rather than the statutory notice requirements. *See id.* The Tennessee Court of Appeals has held that a complaint may, under certain circumstances, meet the notice requirements of a statutory bond. *See id.*

The parties in this case dispute whether the bond was statutory or common law. The Tennessee Supreme Court considered a similar bond in *Koch v. Construction Technology Inc.*, 924 S.W.2d 68 (Tenn. 1996). The bond in *Koch* provided that the general contractor and surety would pay for all labor and materials used in the project. *See id.* at 74. In addition, it provided that they

would also "pay all just claims for damages and injuries to property." *Id.* The intermediate appellate court held that the bond was statutory. This was reversed by the Supreme Court:

> We cannot agree with the Court of Appeals' conclusion that the bond is statutory. While § 12-4-201 merely requires the general contractor to pay for all the labor and materials used by the general contractor or an immediate or remote subcontractor, the bond in the instant case goes further. In the second paragraph quoted above, the principal and surety agree not only to pay for labor and materials, but also to pay "all just claims for damages and injuries to property." This is clearly an obligation above and beyond that contemplated by the statutes. Moreover, the bond makes no explicit reference to the Tenn. Code Ann. § 12-4-201 -- 12-4-206, a fact that this Court found significant in *Fischer*, supra; and it neither expressly sets forth any notice requirements nor limits the time for bringing an action on the bond. Therefore, we conclude that the bond is of the common-law variety.

*Id.* Thus, factors to be considered in determining whether a bond is statutory or common law are: (1) whether the obligations of the surety and contractor go beyond the statutory obligations, (2) whether the bond references the relevant Tennessee Code provisions, and (3) whether the bond contains notice or time limitations.

The bond issued by Frontier Insurance in this case provides:

> NOW, THEREFORE, if the Principal [Lewis Construction] shall promptly make payment to all persons, firms, subcontractors, and corporations furnishing material for or performing labor in the prosecution of the work provided for in such Contract and any authorized extension or modification thereof . . . consumed or used in connection with the construction of such work; for all insurance premiums on said work; and for all labor performed in such work whether by subcontractor or otherwise, then this obligation shall be void; otherwise it shall remain in full force and effect.

This bond does not "merely require[ ] the general contractor to pay for all the labor and materials used by the general contractor or an immediate or remote subcontractor, the bond in the instant case goes further." *Id.* at 74. The bond in this case also requires the principal and surety to pay for "all insurance premiums on said work." As with the bond in *Koch*, this bond contains no reference to Tennessee Code Annotated §§ 12-4-201 to -206, nor does it set forth notice requirements or time limits for bringing an action on the bond. *See id.*

Considering the factors discussed in *Koch*, we conclude that the bond in this case is a common law bond. Consequently, White's Plumbing is obligated only to comply with the terms found within the bond, not with the statutory notice requirements. *See Wal-Board Supply Co. v. Daniels*, 629 S.W.2d 686 (Tenn. App. 1981). The bond contains no notice requirements; therefore Lewis Construction's defense that it did not receive the required notice must fail.

13

On appeal, Lewis Construction also asserts that it should not be held liable to White's Plumbing for breach of contract because White's Plumbing failed to give Lewis Construction notice of the alleged defects and thus deprived Lewis Construction the opportunity to cure. In support, Lewis Construction cites *McClain v. Kimbrough Construction Co.*, 806 S.W.2d 194, 198 (Tenn. App. 1990). However, Lewis Construction's superintendent of the JHA project, Wayne Nelson, testified that he had received notice from White's Plumbing of alleged breach:

> Q: Now, up through December of 1994, did Mr. White complain to you that he was being delayed and that he was incurring additional costs and that some things had to be changed? Did you ever hear anything like that from Mr. White?
> A: Yes.
> Q: What did he tell you?
> A: He said that he was going to finish the job, but he was going to try to recover his losses up through the job.

As noted above, White's Plumbing asserts that Lewis Construction's failure to coordinate the subcontractors caused delays which in turn increased White's Plumbing expenses. Jerry White's conversation with Nelson put Lewis Construction on notice that these delays were causing White's Plumbing to incur additional costs. This argument is without merit.

On appeal, Lewis Construction and White's Plumbing each accuse the other of being the first party to breach the contract. White's Plumbing argues that Lewis Construction breached first because of its failure to coordinate the job and, alternatively, because of its failure to pay all amounts due under the contract. Lewis Construction claims that it was justified in not paying the amounts due under the contract, because of White's Plumbing failure to provide the necessary close-out documents.

The trial court's award of damages to White's Plumbing for breach of contract contains an implicit finding that White's Plumbing was not the first party to breach the contract and that Lewis Construction caused the first material breach. "A party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract." *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 199 (Tenn. App. 1990). Thus, if White's Plumbing breached the contract first, it would not be entitled to damages for Lewis Construction's failure to pay the amounts due under the contract. The only breach of contract alleged against White's Plumbing was its failure to provide the required close-out documents. The trial court implicitly found for White's Plumbing on this issue.

14

There was conflicting testimony on whether White's Plumbing provided all documentation required by the project manual. Jerry White repeatedly testified that the invoices for the water heaters contained all the information required by the project manual, including the serial numbers of the heaters; Linda Lewis testified that the invoices were not sufficient. Linda Lewis stated that White's Plumbing never provided the certificate of release; Jerry White testified that he had sent the release to Lewis Construction. In addition, Jerry White testified that he had provided the JHA with all maintenance parts required by the project manual. An order form from Tennessee Pump and Supply Company dated July 15, 1995 showing that White's Plumbing ordered these parts was introduced at trial. Linda Lewis testified that the JHA notified her on July 21, 1995 and July 27, 1995 that they had not yet received the maintenance parts. A letter from Lewis Construction to White's Plumbing dated July 27, 1995 informed White's Plumbing that the JHA had not received the parts, and thus would not release the retainage. Nevertheless, the JHA released the retainage to Lewis Construction in September, 1996.

Neither party included copies of the water tank invoices in the record on appeal, in order to determine if they comply with the requirements of the project manual. Consequently, on appeal, our assessment of whether these invoices were sufficient hinges on the credibility of the witnesses. Likewise, the contradictory testimony on the additional maintenance parts and the release turns on the credibility of the parties. When the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See In re Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997); *Whitaker*, 957 S.W.2d at 837.

Taking into account the trial court's implicit credibility determination and its implicit factual finding that the documentation provided by White's Plumbing met the requirements of the contract, we find that the evidence does not preponderate against the trial court's finding on this issue. This factual finding is affirmed.

15

It is undisputed that the original contract between the parties was for $151,000 and that the two change orders increased the amount of the contract to $152,790. It was also undisputed that Lewis Construction paid White's Plumbing $138,651.34 under the contract, leaving a balance of $14,138.66 plus $1412.50 for the extra work that White's Plumbing performed. In her testimony, Linda Lewis conceded that White's Plumbing fully performed all of the physical work required of it by the contract.

If White's Plumbing did not cause the first material breach of the contract, then White's Plumbing is clearly entitled to the undisputed amounts due under the contract as well as the amounts due for the extra work performed. The trial court's award of damages to White's Plumbing for breach of contract is affirmed on this basis. As a result, it is unnecessary to reach the issue of whether White's Plumbing produced sufficient proof on Lewis Construction's failure to coordinate the project.

Lewis Construction next argues that the trial court erred in awarding delay damages to White's Plumbing. This issue turns on the extent to which the subcontract incorporated the project manual. Neither party disputes that the language of the subcontract references the project manual; however, they dispute whether this language incorporates all or only part of the project manual. Lewis Construction contends that the 278 day deadline in the project manual was final, subject to the JHA's authority to unilaterally change the deadline. Lewis Construction also asserts that, because the subcontract incorporated the provisions pertaining to the JHA's ability to extend the deadline, White's Plumbing was also subject to the thirty-day notice provision for expenses related to extensions or change orders. White's Plumbing argues that the entire project manual was not incorporated into the subcontract, and therefore White's Plumbing's subcontract was not subject to unilateral extension of the contract deadline by the JHA.

Interpretation of a written agreement is a matter of law and not of fact, thus our review is *de novo* upon the record with no presumption of correctness attached to the trial court's interpretation. *See APAC-Tennessee, Inc. v. J.M. Humphries Const. Co.*, 732 S.W.2d 601, 604 (Tenn. App. 1986); *see also Gredig v. Tennessee Farmers Mut. Ins. Co.*, 891 S.W.2d 909, 912 (Tenn. App.

16

1994); Tenn. R. App. P. 13(d). "Incorporation by reference" is defined in Black's Law Dictionary as follows:

> The method of making one document of any kind become a part of another separate document by referring to the former in the latter, and declaring that the former shall be taken and considered as a part of the latter the same as if it were fully set out therein.

Black's Law Dictionary, 766-67 (6th ed. 1990). "Although neither physical attachment nor specific language is necessary to incorporate a document by reference, the incorporating instrument must clearly evidence an intent that the writing be made part of the contract." *United Cal. Bank v. Prudential Ins. Co. of Am.*, 681 P.2d 390, 410 (Ariz. App. 1983) (citing *Industrial Comm'n v. Arizona Power Co.*, 37 Ariz. 425, 295 P. 305 (1931); *Beedy v. San Mateo Hotel Co.*, 27 Cal.App. 653, 150 P. 810 (1915); 17A C.J.S. Contracts § 299 at 136 (1963)). The subcontract references the "plans and specifications for Jackson Housing Authority Modernization Program," which accurately describes the project manual. This reference is sufficient to incorporate the project manual into the subcontract.

The extent to which the project manual is incorporated into the subcontract must now be determined. In support of its argument, White's Plumbing relies on *APAC-Tennessee, Inc. v. J. M. Humphries Constr. Co.*, 732 S.W.2d 601 (Tenn. App. 1986). *APAC* involved a suit by a subcontractor against the general contractor. The parties disputed whether certain provisions found in the prime contract between the general contractor and the owner were made a part of the subcontract. The subcontractor argued that the general incorporation clause in the subcontract incorporated all provisions of the prime contract, including payment provisions. The general contractor argued that the general incorporation clause merely incorporated the provisions of the prime contract relating to the plans and specifications and not any payment provisions. *See id.* at 604-05. The appellate court held that payment provisions in the prime contract were not incorporated into the subcontract. *See id.* at 606. The appellate court reasoned that the subcontract contained specific payment clauses, which did not allow any pay increases or decreases, while the prime contract permitted payment adjustments. *See id.* In addition, the subcontract contained a provision providing that the subcontract would govern if there were inconsistencies between the subcontract and the prime contract. *See id.* In this case, however, unlike in *APAC*, the subcontract contains no provisions that conflict with the prime contract.

17

"[T]he true rule . . . is that in the case of subcontracts, . . . a reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified." *Guerini Stone Co. v. P. J. Carlin Constr. Co.*, 240 U.S. 264, 277-278, 36 S. Ct. 300, 306, 60 L. Ed. 636 (1916) (holding that a subcontract designating that the subcontractor's work must be performed "according to the said drawings and specifications" of the prime contract, "was evidently for the mere purpose of indicating what work was to be done, and in what manner," and thus the subcontractor was not bound by other provisions in the prime contract allowing the owner to make changes or extensions). However, where the reference to the prime contract is not for a specific purpose and is more general, the effect of the reference is a broader incorporation of the prime contract. *See Sime Construction Co. v. Washington Public Power Supply Sys.*, 621 P.2d 1299, 1303 (Wash. App. 1980) (rejecting the subcontractor's argument that the subcontract incorporated the prime contract only to the extent it defined the scope of the subcontractors work and holding that the notice procedures for delay damages were also incorporated into the subcontract); *see also Westinghouse Elec. Supply Co. v. Fidelity and Deposit Co. of Md.*, 560 F.2d 1109, 1115-16 (3d Cir. 1977) (holding that language in a subcontract that the subcontractor would "furnish all labor, material, and equipment to complete electrical work in its entirety . . . in accordance with plans and specs" was sufficient to incorporate the force account provisions of the prime contract that provided for calculation of compensation for change orders).

Thus, if the subcontract between Lewis Construction and White's Plumbing referenced the project manual for the limited purpose of indicating what work was to be done and in what manner, the project manual would be incorporated only to the extent that it addressed the scope of the work and the specifications for the work. The administrative and procedural provisions of the prime contract, such as the ability of the owner to unilaterally extend the contract and the notice provisions for increased costs caused by such an extension, would not be incorporated. On the other hand, if the reference to the project manual was more general, both the contract specifications and the procedural provisions of the project manual concerning delay damages would be incorporated by reference.

As noted above, the subcontract references the "plans and specifications for Jackson Housing Authority Modernization Program." This clearly indicates that the work is to be performed in accordance with the plans and specifications in the project manual. In addition, the subcontract

18

provided that payment was to be made "per specifications." This indicates an intent by the parties to incorporate the provisions of the project manual regarding payment procedures as well.

Moreover, the subcontract in this case contains no completion deadline or provisions addressing extension or delay damages. From this it can be inferred that the parties intended to refer to the prime contract on these issues. In addition, Jerry White testified that he relied on the project manual extensively when he was preparing his bid, *including the completion deadlines* in the project manual. Indeed, White's Plumbing consistently relies on the provisions of the project manual in almost all aspects of this appeal, including the provisions detailing the general contractor's duties regarding coordination of the project, sanitary conditions, and job site conditions. White's Plumbing's actions support the conclusion that the parties intended for the project manual to be incorporated into the subcontract for general purposes, rather than for specific purposes only. This would include the provisions of the project manual concerning the JHA's ability to enter change orders, including extensions, and the notice requirements for subsequent adjustments to the parties' compensation.

The project manual provides that the JHA can unilaterally enter change orders; however, if such a change order causes an increase in cost to the contractor, the JHA "shall make an equitable adjustment." Under these circumstances, White's Plumbing was required to assert a claim for recovery within thirty days:

> The Contractor must assert its right to an adjustment under this clause within 30 days after (1) receipt of a written change order . . . , or (2) the furnishing of a written notice . . . , by submitting a written statement describing the general nature and the amount of the proposal. . . . No proposal by the Contractor for an equitable adjustment shall be allowed if asserted after final payment under this contract.

Since White's Plumbing's contract was with Lewis Construction, and not with the JHA, White's Plumbing was required to submit its claim for an adjustment under the subcontract to Lewis Construction. *See Sime Construction Co. v. Washington Public Power Supply Sys.*, 621 P.2d 1299, 1303 (Wash. App. 1980). As White's Plumbing failed to comply with the notice procedures in the project manual, its claim for delay damages under the subcontract is barred. The trial court's award to White's Plumbing of $96,138.45 for delay damages and prejudgment interest is reversed.

In sum, this case is remanded for the trial court's clarification of the authenticity of the contractor's bond attached to White's Plumbing's complaint. White's Plumbing was not required to comply with the ninety-day statutory notice requirements found in Tennessee Code Annotated

19

§12-4-205 because the bond was a common law bond rather than a statutory bond. The trial court's award of damages for breach of contract is affirmed. The trial court's award of delay damages is reversed because of White's Plumbing failure to comply with the notice requirements contained in the project manual incorporated by reference into the subcontract.

The decision of the trial court is affirmed in part, reversed in part, and remanded as set forth above. Costs are taxed equally to Appellant and Appellee, for which execution may issue if necessary.


_____**HOLLY KIRBY LILLARD, J.**

**CONCUR:**


_____
**ALAN E. HIGHERS, J.**


_____
**DAVID R. FARMER, J.**

20